***********
The Full Commission, based upon the record of the proceedings before Deputy Commissioner Gregory, and the briefs and oral arguments on appeal, reviewed this matter. Based upon their assignments of error, the defendants have not shown good ground to amend the holding of the Deputy Commissioner. The Full Commission HEREBY AFFIRMS the holding of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner on 17 July 2002 as:
 STIPULATIONS
1. The Employee is Yenory Quertermous.
2. The Employer is Mohican Mills.
3. The Carrier on the risk is The Hartford.
4. At all relevant times, defendant-employer regularly employed three or more employees and was bound by the N.C. Workers' Compensation Act. The employer-employee relationship existed between defendant-employer and plaintiff on or about October 3, 2000, the date of plaintiff's compensable injury by accident.
5. All parties agree that at the time of the injury, plaintiff's average weekly wage was $357.42, yielding a compensation rate of $238.29 per week.
6. The parties stipulated into evidence, without need for further authentication or verification, Stipulated Exhibits #1-5 consisting of plaintiff's medical records, plaintiff's personnel file, Industrial Commission forms, Defendants' Answers to Interrogatories and Plaintiff's Answers to Interrogatories.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a forty-seven years old. She is from Costa Rica who came to the United States when she was five years old. Plaintiff is a high school graduate who began working for defendant-employer in 1978 as a knitter where she continued working until her December 2001 lay-off.
2. Plaintiff's work history consists only of employment at defendant-employer where her job duties included monitoring the knitting machines and repairing the machines when the yarn was stuck. Plaintiff was required to walk back and forth on concrete floors and to climb and descend ladders whenever she needed to fix a machine. The ladders that plaintiff climbed were approximately two to three steps or five feet high. Plaintiff worked eight hours a day, five or six days a week. Plaintiff estimated that she climbed a ladder five to fifteen times a day on the average. Plaintiff's job required standing, walking or climbing for the majority of the shift.
3. On October 3, 2000, plaintiff was climbing a ladder to repair a knitting machine when she slipped and fell from the ladder injuring her right knee, which struck the concrete floor. Plaintiff's claim was accepted as compensable by defendants on a Form 60.
4. After an MRI, plaintiff was diagnosed with a fractured lateral tibial plateau and a complete anterior cruciate ligament (ACL) tear. Dr. Michael Nicks, an orthopaedic surgeon with Hickory Orthopaedic Center, began treating plaintiff conservatively on October 4, 2000. However, when conservative treatment failed, Dr. Nicks performed arthroscopic surgery as well as an ACL reconstruction on plaintiff's right knee on January 29, 2001. Plaintiff had a large fissure in the lateral tibial plateau condral surface, which was left untreated, as it appeared stable.
5. After surgery, plaintiff attended physical therapy and continued to follow up with Dr. Nicks for her ongoing complaints of pain and instability. According to Dr. Nicks, plaintiff has a low tolerance for pain, which impeded her recovery. According to plaintiff, her knee becomes painful after sitting for an hour. In fact, plaintiff's intolerance for pain caused her to have difficulty in performing all required tasks during her functional capacity evaluation.
6. On June 7, 2001, Dr. Nicks released plaintiff at maximum medical improvement with a 10% permanent partial impairment rating to her knee based on his findings during surgery. Dr. Nicks found plaintiff at risk for arthritis and recommended permanent restrictions of limited bending, stooping and climbing. Dr. Nicks indicated that plaintiff's ongoing problems with pain would be limiting to her.
7. On September 10, 2001, plaintiff sought a second opinion from Dr. Robert Blake, an orthopaedic surgeon, who found that plaintiff had effusion or swelling in the right knee joint. According to Dr. Blake, plaintiff's chronic effusion is indicative of traumatic arthritis and plaintiff's complaints of pain are consistent with her condition. Dr. Blake agreed that plaintiff had reached maximum medical improvement and assessed plaintiff with a 20% permanent partial impairment to her right leg based on plaintiff's limited range of motion, altered sensation, residual instability and articular fracture to the lateral plateau with minimal displacement and chronic knee joint effusion. Dr. Blake issued permanent restrictions of limited squatting, kneeling and ladder climbing and no pushing or pulling greater than 20 pounds. Dr. Blake felt that plaintiff would require long-term anti-inflammatory medication and probably a total knee replacement.
8. Prior to plaintiff's release at maximum medical improvement and approximately one month after her January 29, 2001 surgery, she returned to work on February 23, 2001 with light duty restrictions of no climbing, bending, prolonged standing or walking on uneven floors. Plaintiff could not perform her regular job as a knitter considering her restrictions; therefore, her supervisor, Jim Baxter, "set up an ongoing position" in the chain room for plaintiff sorting yarn according to the link size. According to Mr. Baxter, while sorting yarn was a duty performed in the chain room by other employees, plaintiff was assigned to the chain room sorting yarn to accommodate her restrictions. In fact, plaintiff would not have been assigned to that position had she not been injured as there was no need for an additional worker in the chain room. In addition, according to Mr. Baxter, plaintiff would have been laid off sooner had she not been injured and the employees who were in the chain room prior to plaintiff were laid off first.
9. Plaintiff performed the chain room job for approximately 4 months. While working, plaintiff's knee would become painful and swollen if she sat too long and she would have to stand and walk on occasions. Plaintiff could perform this job at her own pace and could take as many breaks as she needed. Plaintiff complained of pain to Mr. Baxter who made sure that plaintiff's complaints were adequately addressed with modifications. However, plaintiff did not complain to Sharon Smiley, defendant-employer's coordinator of safety and human resources, or to Dr. Nicks. Plaintiff indicated that she could not communicate with Dr. Nicks and that he did not care.
10. After plaintiff returned to light-duty work and approximately 2 to 3 weeks after Dr. Nicks' release, in June 2001, defendant-employer requested that employees volunteer for temporary lay-offs due to the economic crisis the company was facing. As plaintiff was having difficulty with her job due to pain and felt that she needed additional time to recuperate, plaintiff volunteered for the lay-off.
11. Plaintiff was temporarily laid off for approximately two months. When plaintiff returned to work she was again placed in the chain room. At that time, employees were being laid off due to economic difficulties so the possibility of a job in the spooling department was discussed by Ms. Smiley and defendant-carrier's adjuster. In addition, Mr. Baxter discussed the spooling position with plaintiff but both plaintiff and Mr. Baxter were concerned with the amount of sitting required by the spooling job. Regardless, the spooling job was eliminated due to the decline of the company and there was little light duty available. Therefore, plaintiff was instead placed in the office performing a job shredding paper for eight hours a day at her own pace. This job was necessary for shredding documents from the plants, which had closed and it allowed defendant-employer to create a light-duty job for plaintiff.
12. On the first day that plaintiff performed the shredding job, she had difficulty with her knee because she could not stand and move the large stacks of paper. After complaining to Mr. Baxter, he assigned other employees to assist plaintiff with the shredding job so that she could merely sit and shred the paper and occasionally drag bags a few feet. Mr. Baxter admitted that this job was not a full time position available in the market place but that it was a temporary duty necessary as a result of plant closings. Plaintiff was placed in this job to accommodate her and to keep her from being laid off, as other knitters and employees in the chain room were laid off first.
13. Plaintiff performed the shredder job until she was permanently laid off on December 12, 2001. A company wide lay-off affecting up to 30% of defendant-employer's work force occurred on December 10, 2001 of which plaintiff was a part. However, Mr. Baxter did not provide the information to plaintiff's direct supervisor until the following Monday as he was reluctant to lay plaintiff off. According to Mr. Baxter and Ms. Smiley, the company had been downsizing and was one-third its original size. Prior to this downsizing, machine operators would often work on only one machine. However, after this downsizing occurred, the employees that did not get laid off were required to perform several different functions, which plaintiff would have been unable to perform.
14. Plaintiff experiences frequent pain and numbness in her right leg and difficulty with her balance. However, the severity of plaintiff's pain fluctuates. Plaintiff must elevate her leg to relieve the pain. In addition, plaintiff has begun to have some pain in her left leg and she walks with a limp. However, plaintiff is physically capable of work within her restrictions. Nevertheless, after reasonable attempts to obtain employment since she was laid off, plaintiff has been unsuccessful due to her pain, restrictions, and lack of education and work experience.
15. At the time of the hearing, plaintiff was receiving unemployment benefits of $189.00 per week and applying for at least two jobs a week pursuant to Employment Security Commission guidelines for receiving benefits.
16. Plaintiff's complaints of pain are credible. Plaintiff was only capable of performing the chain room job and the shredder job due to the accommodations made by defendants and because the jobs were very flexible and plaintiff could perform the jobs at her own pace.
17. While plaintiff's restrictions were accommodated by defendants, the greater weight of the evidence indicates that the positions in both the chain room and the office were "make-work" positions. While separating yarn was an essential duty in the chain room, there was no need for plaintiff in the chain room and she was placed there only to create a position, which would accommodate her restrictions. Furthermore, the chain room job was modified to any degree requested by plaintiff and plaintiff was retained as an employee in the chain room longer due to her injury when others were being laid off. Furthermore, plaintiff's work in the chain room occurred for the most part before she reached maximum medical improvement. Moreover, the shredding job is admittedly not a job available normally with defendant-employer or in the market place. Plaintiff's lay off was in part due to her restrictions in that the company truly had no jobs available in the market place at the time of plaintiff's release to return to work and accommodating plaintiff became more difficult.
18. While plaintiff is physically able to work within her restrictions provided by Dr. Nicks and Dr. Blake, she is nevertheless incapable of earning the same or greater wages in any employment as a result of her injury by accident in that plaintiff could not return to work at her former position and due to her pain, restrictions, employment history, and education, plaintiff has been unsuccessful in locating suitable employment as a result of her injury. Plaintiff's work with defendant- employer in the chain room and in the office shredding paper is not indicative of her wage earning capacity as neither job is representative of suitable employment available in the market-place. While the economy may have affected plaintiff's ability to return to work, the greater weight of the evidence nevertheless demonstrates that plaintiff is incapable at this time of earning wages due to her injury by accident.
19. There is a substantial risk that plaintiff will require future medical treatment including long-term anti-inflammatory medication and a total knee replacement.
20. Plaintiff reached maximum medical improvement on June 7, 2001 and retains a 20% permanent partial impairment of her right knee.
21. Plaintiff's average weekly wage is $357.42, yielding a compensation rate of $238.29 per week.
 ***********
Based on the foregoing findings of facts, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to her right knee on October 3, 2000. N.C.G.S. § 97-2(6).
2. Plaintiff's work in the chain room and as a shredder is not representative of her earning capacity in the labor market, as plaintiff's earning capacity is not measured by "the largesse of a particular employer" but is instead measured by her "own ability to compete in the labor market." People v. Cone Mills Corporation,316 N.C. 426, 437, 342 S.E.2d 798, 805 (1986). The laws governing suitable employment ensure that employment is truly reflective of wage earning capacity and ensure that injured workers such as plaintiff are truly employable within the general labor force at the time weekly benefits are no longer available in order to protect the injured worker against factors such as a termination at will by the employer or factors beyond the control of an employer which eliminate any "make work" positions. Id.
3. Furthermore, the job in the chain room was modified to the extent that it was not indicative of plaintiff's earning capacity in the general labor market. In addition the job in the office as a shredder was a newly created job not available in the general economy and not indicative of plaintiff's earning capacity in the general labor market. Saums v. RaleighCommunity Hospital, 346 N.C. 760, 487 S.E.2d 746 (1996).
4. Considering plaintiff's pain, restrictions, education, limited work history and unsuccessful attempts to locate employment, she is incapable as a result of her injury of earning wages in any employment beginning December 12, 2001 and continuing until she returns to work at the same or greater wages or until further order of the Commission. Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. Plaintiff is entitled to temporary total disability benefits at a weekly rate of $238.29 from December 12, 2001 and continuing until she returns to work at the same or greater wages or until further order of the Commission. N.C.G.S. § 97-29.
6. Defendants are entitled to a credit for plaintiff's unemployment benefits at a rate of $189.00 per week for the number of weeks she receives unemployment benefits. N.C.G.S. § 97-42.1.
7. Plaintiff is entitled to all reasonably necessary medical treatment incurred or to be incurred as a result of her compensable injury by accident for so long as such treatment tends to effect a cure, provide relief or lessen plaintiff's period of disability, including vocational rehabilitation and future medical treatment with anti-inflammatory medications and a total knee replacement. N.C.G.S. §§ 97-25; 97-25.1.
 ***********
Based upon the foregoing findings of facts and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner, and enters the following:
 AWARD
1. Subject to a credit for unemployment benefits received by plaintiff and a reasonable attorney's fee, defendants shall pay plaintiff temporary total disability benefits at a weekly rate of $238.29 from December 12, 2001 and continuing until she returns to work at the same or greater wages or until further order of the Commission.
2. Defendants shall pay all reasonably necessary medical expenses for treatment incurred or to be incurred as a result of plaintiff's compensable injury by accident for so long as such treatment tends to effect a cure, provide relief or lessen plaintiff's period of disability, including vocational rehabilitation and future medical treatment with anti-inflammatory medications and a total knee replacement, if necessary.
3. An attorney's fee in the amount of 25% of the compensation due plaintiff is hereby approved to be deducted from the lump sum due plaintiff and paid directly to plaintiff's counsel and thereafter by deducting every fourth check to be paid directly to plaintiff's counsel.
4. Defendants shall bear the costs due the Commission and any expert witness fees, if not already paid.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ DIANNE C. SELLERS COMMISSIONER